UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**WADE BROWN**,                                          Case No. 5:14 CV 940

        Plaintiff,                           Magistrate Judge James R. Knepp II

  v.                                          MEMORANDUM OPINION AND
                                                    ORDER

**COMMISSIONER OF SOCIAL SECURITY**,

        Defendant.

### INTRODUCTION

Plaintiff Wade Brown filed a Complaint against Defendant Commissioner of Social Security's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The parties have consented to the exercise of jurisdiction by the undersigned in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 14). For the reasons given below, the Court affirms the Commissioner's decision denying benefits.

### PROCEDURAL BACKGROUND

On January 3, 2011, Plaintiff filed for DIB and SSI alleging a disability onset date of October 30, 2007[1]. (Tr. 258-67). Plaintiff's claim was denied initially (Tr. 150, 168) and on reconsideration (Tr. 186-89).  Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 226-27). On September 11, 2012, Plaintiff (represented by counsel), a medical expert, and a vocational expert ("VE") testified at the hearing, after which Plaintiff was

---

1. A prior hearing decision in this case was issued on September 24, 2010. (Tr. 118-32). As both parties have acknowledged, this hearing decision has the effect of *res judicata* and disability can only be considered as of September 25, 2010. (Doc. 16, at 2; Doc. 18, at 1).

found not disabled on December 20, 2012. (Tr. 58-117). On March 15, 2014, the Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-4); 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481.

FACTUAL BACKGROUND

### Personal and Vocational Background

Born March 30, 1963, Plaintiff was 49 years old at the time of the hearing before the ALJ. (Tr. 87). Plaintiff lived alone and had not had a drivers' license since 2005 due to an inability to pay court costs. (Tr. 88). He completed high school and had past work experience as a janitor and groundskeeper. (Tr. 89).

### Medical Evidence

Physical Impairment Evidence

On November 22, 2010, Plaintiff saw Julio Romero, M.D., for a follow-up for his diabetes, hypertension, hyperlipidemia, hypertension, and knee and shoulder pain. (Tr. 420). On the day of the appointment, he was homeless and working on getting an apartment. (Tr. 420). He said he still had chronic pain despite taking his medications as prescribed and that a brief jail stay had prevented continued physical therapy, although he planned to reschedule. (Tr. 420). On examination, Plaintiff appeared healthy, alert, oriented, and cooperative with normal memory, and unimpaired insight and judgment. (Tr. 422). He had right shoulder joint tenderness and an abnormal range of motion, but the remainder of his examination revealed normal findings. (Tr. 422).

Plaintiff was examined by Dr. Romero again on February 28, 2011, and Plaintiff denied having any new complaints. (Tr. 760). On examination, Dr. Romero noted Plaintiff's shoulder

range of motion was abnormal and he had knee joint tenderness but otherwise normal findings. (Tr. 762).

On April 5, 2011, state agency reviewer Gary Hinzman, M.D., reviewed the medical evidence of record for Plaintiff's physical impairments. (Tr. 146). Dr. Hinzman opined Plaintiff could carry up to 10 pounds frequently and 20 pounds occasionally; could stand or walk for six hours in an eight-hour workday; could sit for six hours in an eight-hour workday; had unlimited ability to push/pull except with the same weight limitations as for lifting and carrying; could climb ramps, stairs, ladders, ropes, or scaffolds; could balance and stoop without limitation but could never kneel or crouch and only occasionally crawl. (Tr. 144-45). Dr. Hinzman stated these limitations were due to Plaintiff's multiple sclerosis pain. (Tr. 145). Dr. Hinzman further opined that Plaintiff's right overhead reaching was limited but that Plaintiff had otherwise unlimited reaching, handling, fingering, and feeling. (Tr. 145-46).

Plaintiff returned to Dr. Romero on May 6, 2011, and Dr. Romero noted Plaintiff had been doing well since his last visit. (Tr. 748).  Dr. Romero continued to note chronic right shoulder and left knee pain. (Tr. 749-50). On examination, Plaintiff had shoulder tenderness but a normal range of motion and knee tenderness with an abnormal range of motion. (Tr. 750).

On May 25, 2011, state agency physician Teresita Cruz, M.D., reviewed the medical evidence of record and largely affirmed Dr. Hinzman's findings except she concluded Plaintiff could frequently kneel, crouch, and crawl. (Tr. 181-82).

On August 29, 2011, Plaintiff saw Michael Fistek, D.O., at the Internal Medicine Center of Akron and reported worsening pain in his hands and legs and sharp chest pain in his left side, radiating into his left shoulder. (Tr. 734). Physical examination revealed abnormal light touch and vibration sensation along with abnormal pin prick sensation of the foot. (Tr. 737). Plaintiff

3

had no sensation in his left foot from his heel to his ankle. (Tr. 737). Plaintiff's sensation was better on the right side but there was still no sensation from his heel to the base of his ankle. (Tr. 737).  Dr. Fistek ordered an EKG which showed new inverted T waves. (Tr. 737). Dr. Fistek ordered a stress test, increased his gabapentin dose, decreased his Lipitor dose, and referred Plaintiff to ophthalmology. (Tr. 737-38). Plaintiff's stress test came back normal on September 7, 2011. (Tr. 647).

Plaintiff was seen again at the Internal Medicine Center of Akron for neuropathic pain in his legs, hands, and feet. (Tr. 715). Plaintiff reported that the pain was now so great he could no longer open a jar in his kitchen. (Tr. 715). He said Percocet provided little relief and he could not afford pain management. (Tr. 715).

Plaintiff returned to Dr. Fistek on November 11, 2011, and continued to report right shoulder and hand pain. (Tr. 972). On examination, Plaintiff had joint tenderness and an abnormal range of motion in his right shoulder and wrist. (Tr. 974). Dr. Fistek said Plaintiff could only rotate 90 degrees on his right shoulder, had pain immediately when he abducts, and had pain even on a passive range of motion test. (Tr. 974). Dr. Fistek also noted a loud popping noise in the shoulder. (Tr. 715). In the right wrist, Dr. Fistek noted tingling in fingers three through five when tapping and significant pain during the Phalan's test without numbness or tingling. (Tr. 974). Plaintiff also had joint tenderness and abnormal range of motion in his left wrist. (Tr. 974). Dr. Fistek stated Plaintiff's shoulder pain was likely secondary to recurrent tendinitis and ordered an MRI along with prescriptions to continue opiates plus anti-inflammatories, physical therapy, and possible injections. (Tr. 975). He further stated Plaintiff's wrist pain was likely secondary to osteoarthritis but indicated x-rays should be checked and recommended Plaintiff try wrist splints. (Tr. 975).

4

X-rays of Plaintiff's wrists were taken on November 18, 2011, and came back with normal findings. (Tr. 776). Plaintiff's right shoulder MRI was taken on November 17, 2011, and revealed no significant changes when compared to the February 2010 MRI. (Tr. 778). Plaintiff's supraspinatus tendon's appearance was consistent with a combination of tendinosis and surgical repair. (Tr. 778). There was a thickening of the infraspinatus tendon also consistent with tendinosis as well as tendinosis of the subscapularis. (Tr. 778).

Plaintiff was admitted to the hospital from February 19, 2012 to February 21, 2012, after three weeks of worsening shortness of breath followed by chest pain. (Tr. 779). Plaintiff was diagnosed with acute coronary syndrome, coronary artery disease, and acute on chronic diastolic congestive heart failure. (Tr. 779). Plaintiff's secondary diagnoses included controlled hypertension, dyslipidemia, diabetes mellitus type 2 uncontrolled, acute on chronic kidney disease probably due to diabetic nephropathy, chronic pain, chronic microcytic anemia, microscopic hematuria, and shortness of breath. (Tr. 779).

Plaintiff participated in cardiac rehabilitation, walking about one mile every day. (Tr. 903). Still, Plaintiff continued to struggle with his symptoms and on June 11, 2012, his feet and ankles were swollen from walking in the park with his grandchildren. (Tr. 888). Plaintiff also saw Darryl Anderson, MD, a nephrologist, on July 2, 2012, who concluded Plaintiff likely had early, stage 3 chronic kidney disease. (Tr. 1044).   On July 31, 2012, Plaintiff was admitted to the hospital with chest pain that was most likely secondary to musculoskeletal causes. (Tr. 984).

On August 17, 2012, Plaintiff saw Donald Cho, MD, for his four month cardiac follow up. (Tr. 1012). Plaintiff had no chest pain, joint pain, joint swelling, range of motion limitations, weakness or numbness, and his cardiac, respiratory, and vascular systems were normal. (Tr. 1013-14).

5

Mental Impairment Evidence

On February 25, 2011, Cynthia Connor, Ph.D., a psychologist and counselor from Path Behavioral Health completed a mental status questionnaire for social security disability. (Tr. 516-18). Plaintiff had a depressed mood, some tearfulness when relating physical and emotional problems, intact judgment, fair insight, an adequate ability to respond to directions and maintain attention for short periods of time, Plaintiff would need help to stay focused on challenging tasks, and socially has difficulty interacting outside of his family. (Tr. 516-17). She indicated Plaintiff had had major depressive disorder since 2007 when he became unemployed and noted Plaintiff's physical pain posed severe limits in functioning. (Tr. 517).

Plaintiff underwent a psychological evaluation by request on March 19, 2011, with Gary Sipps, Ph.D. (Tr. 635-40). On examination, Plaintiff had good hygiene and was neatly and appropriately dressed but presented visible signs of muscle tension and awkward gestures consistent with anxiety. (Tr. 636). In terms of daily activities, Plaintiff reported arising between 7:00 and 8:00 A.M., when he would drink coffee and wash dishes. (Tr. 638). He would watch television and then look out the window and do nothing. (Tr. 638). When asked about social interaction, he said he would check on his mother and used to talk with his friend but had limited time on his cell phone. (Tr. 638). Plaintiff attempted to keep his apartment clean by cleaning bathrooms, floors, and washing dishes. (Tr. 638). He reported he was "sometimes lazy" with his personal hygiene. (Tr. 638).

Dr. Sipps diagnosed adjustment disorder with mixed anxiety and chronic depressed mood. (Tr. 638). Dr. Sipps opined that Plaintiff's capacity for remote recall was unimpaired, his capacity for recent recall was mildly impaired, and his immediate memory and  his working memory were mildly impaired. (Tr. 638). He said Plaintiff's ability to understand, remember,

6

and follow simple directions was unimpaired but that Plaintiff was mildly impaired in his ability to remember complex material; his capacity of sustained attention, concentration, and persistence was moderately impaired; and his capacity for social interaction was moderately impaired. (Tr. 638). Dr. Sipps also found Plaintiff was moderately impaired in his ability to relate effectively with the general public, supervisors, and co-workers; moderately impaired in his capacity to tolerate workplace stress; and moderately impaired in his ability to respond to typical and expected work situations as well as variations in the work setting. (Tr. 638-39). Dr. Sipps assigned a Global Assessment of Functioning ("GAF") score of 56[2].

On April 7, 2011, state agency reviewer, Leslie Rudy, Ph.D., reviewed Plaintiff's mental health records. (Tr. 142-48).  She found Plaintiff suffered from an affective disorder and had moderate difficulties maintaining social function; maintaining concentration, persistence, or pace; interacting appropriately with the general public; working in coordination with others; completing a normal workday and work week; getting along with coworkers or peers without distracting them or exhibiting behavior extremes; and in responding appropriately to changes in the work setting. (Tr. 142, 146-47). Dr. Rudy also opined that Plaintiff's anxiety interfered with his ability to complete tasks but he retained the capacity to carry out a wide variety of tasks in a setting without demands for fast paced or high production; could interact with others only for brief periods on an occasional, superficial basis; and Plaintiff would need assistance in adapting to change in daily routine with changes needing to be introduced gradually and slowly. (Tr. 147-

---

2. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32-33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A GAF score of 51-60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers and co-workers). *Id.* at 34.

48). On May 26, 2011, state agency reviewer Aracelis Rivera, Psy.D., reviewed the record and made findings largely consistent with Dr. Rudy's findings. (Tr. 179, 183-84).

On September 16, 2011, Plaintiff saw Y. Thakore, M.D., on referral because Plaintiff had been receiving ongoing therapy at Portage Path since 2010 and his therapist felt he could benefit from medication. Tr. 686-88). On mental status exam Plaintiff was fairly groomed, cooperative and pleasant with good eye-contact, his thought process was logical, coherent and goal directed, his mood was depressed but appropriate and he had intact cognition and fair judgment. (Tr. 687). Dr. Thakore diagnosed depressive disorder and assigned Plaintiff a GAF score of 60[3]. Portage Path records between November 17, 2011 and April 13, 2012, reflect treatment for depression, anxiety, frustration, and poor sleep. (Tr. 842-49, 851-56).

Plaintiff's therapist at Portage Path, Robert Waldsmith, LPC, completed a mental medical source statement on June 15, 2012. (Tr. 774-75). Mr. Wadsmith reported Plaintiff was unable to understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods of time, and complete a normal work day and work week without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 774). He found Plaintiff would have noticeable difficulty, i.e. be distracted more than 20% of the time when trying to remember locations and work-like procedures, understanding, remembering, and carrying out very short instructions, work in coordination with or in proximity to others, make simple work-related decisions, interact appropriately with the general public, get along with coworkers or peers, and respond appropriately to changes in the work setting. (Tr. 774-75).

Plaintiff saw Dr. Waldsmith again on August 10, 2012, where he reported feeling better after his recent hospital admission due to chest pain and that he was looking forward to a bike

---

3. See DSM-IV-TR, *supra,* note 2.

club event that weekend where he was preparing chicken wings. (Tr. 1038). On mental status examination, Plaintiff had good insight, judgment, and logical thoughts. (Tr. 1038).

A second mental medical source statement was prepared by Mr. Waldsmith on August 31, 2012 and co-signed by Dr. Conner, a counseling psychologist and clinical supervisor on September 7, 2012. (Tr. 1032-34). Mr. Waldsmith opined that Plaintiff was markedly limited in his ability to understand, remember, and carry out simple instructions; make simple workplace judgments; interact appropriately with the public, co-workers, and supervisors; and respond appropriately to changes in a routine work setting. (Tr. 1032-33). Further, Plaintiff was extremely limited in his ability to understand, remember, and carry out detailed instructions and respond appropriately to work pressures in a usual work setting. (Tr. 1032-33). Mr. Wadsmith indicated this assessment was based on Plaintiff being easily frustrated when interacting with friends, unable to remember what he is talking about mid-conversation, unable to tolerate neighbor's provocation resulting in calls to the police, checking and re-checking his apartment, and talking to himself at times. (Tr. 1033).

Plaintiff's Testimony

At the hearing, Plaintiff testified that his legs and feet swell and his doctor had advised him to elevate his legs and wear compression stockings. (Tr. 94). He elevates his legs to chest level about twice a day. (Tr. 95). He said he could walk for one and a half blocks, could lift and carry ten pounds, but has trouble opening jars and often drops items. (Tr. 98-99, 103). Plaintiff testified about his neuropathy in his hands and feet and also described his anxiety, depression, and insomnia. (Tr. 95, 103, 105-06).

VE Testimony

A Vocational Expert ("VE") testified at the hearing before the ALJ. (Tr. 106). The ALJ asked the VE about a hypothetical person with Plaintiff's vocational background who could occasionally lift or carry up to 20 pounds and frequently lift or carry up to 10 pounds; could stand or walk with normal breaks for about four hours in an eight hour work day; could sit with normal breaks for six hours in an eight hour workday; could push and pull frequently with his bilateral lower extremities; could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl. (Tr. 110). The individual could never climb ropes and scaffolds; was limited to occasional overhead reaching in the right arm; and needed to avoid exposure to all hazards such as machinery and heights. (Tr. 110). Further, the individual would be limited to occasional, superficial interaction with others, would need assistance adapting to change and in daily routine; changes should be introduced frequently and gradually. (Tr. 110). The VE responded that such an individual could not perform his past work, but could perform work as a marker, polisher, and addresser. (Tr. 111-12).

In a second hypothetical, the ALJ asked the VE whether the individual could perform the same jobs if they were limited to sedentary work. (Tr. 113). The VE responded that such an individual could still do the polisher and address position and would also be able to the laminator position.

Next, the ALJ asked about jobs for this person if they occasionally had to raise their legs above chest level during the workday and since he would not know when this was needed it could not be accommodated by normal breaks. (Tr. 113-14). The VE responded that there would not be work this individual could perform. (Tr. 114).

Lastly, Plaintiff's counsel asked the VE about the same hypothetical individual, only this time without the chest raise limitation, who would have difficulty with bilateral handling and fingering, sometimes on an occasional and sometimes on a frequent basis depending on the day. (Tr. 114). The VE opined that, depending on how many days they would be limited to occasional handling and fingering, such an individual would have difficulty sustaining a job. (Tr. 115).

### New Evidence

Following the ALJ decision, Plaintiff presented new evidence to the Appeals Council, which is the basis for his request for a Sentence Six remand for consideration of new evidence. (Doc. 16, at 22); (Tr. 12-21, 30-57). These records reflect that Plaintiff was finally able to participate in physical therapy for his chronic low back pain, intermittent pain, and paresthesias in both extremities; however he made little progress and had difficulty tolerating the exercises due to pain. (Tr. 37, 40, 43-49). Additionally, Plaintiff sought treatment from a pulmonary and critical care physician in early 2013 and had been diagnosed with mild chronic obstructive pulmonary disease and sleep apnea. (Tr. 18-21). Sleep apnea would be a contributing factor to Plaintiff's diastolic dysfunction and diabetes. (Tr. 21).

### ALJ Decision

On December 12, 2012, the ALJ found Plaintiff had the severe impairments of adjustment disorder with mixed anxiety and depressed mood, chronic; diabetes type 2 with diabetic neuropathy and diabetic renal disease, with insulin therapy; congestive heart failure, mild coronary artery disease, osteoarthritis of multiple sites, status post-surgery of the right shoulder for rotator cuff tear with remaining moderate supraspinatus tendinosis without definite evidence of a recurrent tear. (Tr. 64). The ALJ found Plaintiff's impairments considered singly or in combination did not meet or equal a listing. (Tr. 64). Next, the ALJ found Plaintiff had the

residual functional capacity ("RFC") to perform light work with the additional limitations that he could stand, walk, or sit for six hours in an eight-hour workday; push or pull frequently; occasionally climb ladders, ropes, or scaffolds; limited to occasional overhead reaching with the right arm and must avoid all exposure to hazards such as machinery and heights; limited to superficial interaction with others; changes should be introduced infrequently and gradually and should be easily explained; no production rate pace work; but can perform goal oriented work. (Tr. 65-66).

Next, the ALJ found, based on the VE testimony, that Plaintiff could perform work as a marker, polisher, or addresser. (Tr. 71-72).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for DIB and SSI is predicated on the existence of a disability. 42 U.S.C. §§ 423(a); § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's residual functional capacity and can claimant perform past relevant work?

5.  Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy.  *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

DISCUSSION

Plaintiff asserts: (1) the ALJ erred in assessing his RFC because his upper and lower extremity limitations did not support him being able to perform light work as defined in the regulations; (2) the ALJ failed to apply the appropriate standards in evaluating the opinions of Mr. Waldsmith and Dr. Connor; and (3) that new and material evidence submitted to the Appeals Council but not the ALJ, warrants remand. (Doc. 16, at 14-24). Each of these arguments will be addressed in turn.

### *ALJ's RFC Assessment*

Plaintiff argues the ALJ erred in finding he was capable of light work and in omitting restrictions from his RFC assessment. (Doc. 16, at 14). Specifically, Plaintiff notes although his upper and lower extremity limitations were discussed in detail at his hearing and were included in the questions to the VE, the ALJ determined Plaintiff could stand and walk for six hours in an eight-hour work day and did not include limitations in Plaintiff's ability to handle and finger. (Doc. 16, at 14). Further, Plaintiff asserts the ALJ did not articulate why she rejected these restrictions. (Doc. 16, at 14).

A claimant's RFC is an assessment of "the most he can still do despite his limitations." 20 C.F.R. § 416.945(a)(1). An ALJ must consider all symptoms and the extent to which those symptoms are consistent with the objective medical evidence. *Id.*, at § 416.929. An ALJ must also consider and weigh medical opinions. *Id.*, at § 416.927. When a claimant's statements about symptoms are not substantiated by objective medical evidence, the ALJ must make a finding regarding the credibility of the statements based on consideration of the entire record. SSR 96-7p, 1996 WL 374186, *1. On review, the Court may not "try the case de novo, nor resolve conflicts in evidence". *Gaffney v. Bowen*, 825 F.2d 98, 100 (6th Cir. 1987).

14

Review of the record demonstrates that the ALJ thoroughly considered the evidence of record in forming the RFC and rendered a decision supported by substantial evidence. Plaintiff argues his many symptoms such as his shoulder joint pain, limited range of motion, bilateral wrist joint tenderness with abnormal range of motion and tingling, edema in both feet, and abnormal knee rotation, prove he is unable to stand, walk, handle, or finger to the extent provided in the RFC. (Doc. 16, at 16).However, the ALJ considered these limitations in forming her decision. (Tr. 67-69).

The ALJ determined because Plaintiff had been able to walk one mile during his rehabilitation, had a normal range of motion in his elbow and wrist, and normal gait, he was able to walk and stand for six hours out of an eight-hour workday. (Tr. 67-69, 750, 903, 1013-14). Further, the ALJ considered the opinions of the state agency medical consultants Drs. Hinzman and Cruz who both opined that, apart from being limited to occasional overhead reaching, Plaintiff had otherwise unlimited reaching, handling, fingering, and feeling. (Tr. 71, 145-46, 181-82). No medical source opined to the contrary. Thus, substantial evidence supports the ALJ's RFC assessment.

*Credibility*

Next, Plaintiff asserts the ALJ erred in forming his RFC because she failed to provide any explanation for rejecting his subjective complaints in his hands and fingers. (Doc. 16, at 17).

An ALJ is not bound to accept as credible Plaintiff's testimony regarding symptoms. *Cohen v. Sec'y of Dep't of Health & Human Servs.*, 964 F.2d 524, 529 (6th Cir. 1992).  Analysis of alleged disabling symptoms turns on credibility. *See Hickey-Haynes v. Barnhart*, 116 F. App'x 718, 726-27 (6th Cir. 2004). "Because of their subjective characteristics and the absence of any reliable techniques for measurement, symptoms (especially pain) are difficult to prove,

disprove, or quantify." SSR 82-58, 1982 WL 31378, *1. In evaluating credibility, an ALJ

considers certain factors:

> (i) [A claimant's] daily activities;

> (ii) The location, duration, frequency, and intensity of [a claimant's] pain or other symptoms;

> (iii) Precipitating and aggravating factors;

> (iv) The type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate [] pain or other symptoms;

> (v) Treatment, other than medication, [a claimant] receive[s] or ha[s] received for relief of [] pain or other symptoms;

> (vi) Any measures [the claimant] ha[s] used to relieve pain or other symptoms; and

> (vii) Other factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3).

A claimant's subjective complaints can support a claim for disability, but there must also

be objective medical evidence in the record of an underlying medical condition. *Jones v. Comm'r

of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003). Further, "an ALJ is not required to accept a

claimant's subjective complaints and may properly consider the credibility of a claimant when

making a determination of disability." *Id.* at 476 (citations omitted). On review, the Court is to

"accord the ALJ's determinations of credibility great weight and deference particularly since the

ALJ has the opportunity, which we do not, of observing a witness's demeanor while testifying."

*Id.* (citation omitted).

Still, an ALJ's decision to discount a claimant's credibility "must contain specific

reasons for the finding on credibility, supported by the evidence in the case record, and must be

sufficiently specific to make clear to the individual and to any subsequent reviewers the weight

the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, *2.  In reviewing an ALJ's credibility determination, the Court is "limited to evaluating whether or not the ALJ's explanations for partially discrediting [Plaintiff's testimony] are reasonable and supported by substantial evidence in the record." *Jones*, 336 F.3d at 476.

Review of the ALJ's decision demonstrates that the ALJ did in fact assess Plaintiff's credibility and provide reasonable explanations for rejecting Plaintiff's subjective complaints. The ALJ assigned "partial weight" to Plaintiff's statements. (Tr. 70) The ALJ found Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. 67).

The ALJ explained that in terms of Plaintiff's alleged shoulder pain, an MRI had shown he had only mild subscapular tendinosis and moderate supraspinatus tendinosis without definite evidence of a recurrent tear and minimal fluid. (Tr. 67). Further, the ALJ noted that even with the shoulder pain and limited range of motion, the function of Plaintiff's elbow and wrist were normal. (Tr. 67). Additionally, despite knee and ankle pain, he had normal range of motion and reflexes in his knees and ankle. (Tr. 67). Even when a physician had found an abnormal range of motion in Plaintiff's knees, there was no gait disturbance. (Tr. 68).  Further, Plaintiff had been able to participate in cardiac rehabilitation, including walking one mile daily, despite these impairments. (Tr. 68-69).

In sum, the ALJ considered Plaintiff's daily activities and the objective medical evidence and determined Plaintiff was capable of light exertion despite some statements to the contrary.

Thus substantial evidence supports the ALJ's analysis of Plaintiff's credibility and Plaintiff's argument is without merit.

***Opinion Evidence***

Next, Plaintiff alleges the ALJ erred in weighing the June 2012 opinion provided by Mr. Waldsmith and the August 2012 provided by Mr. Waldsmith and co-signed by Dr. Connor. (Doc. 16, at 18). Mr. Waldsmith, as a licensed professional counselor is considered an "other source" under the regulations. 20 C.F.R. § 404.1513(d)(1).

The regulations provide specific criteria for evaluating medical opinions from "acceptable medical sources"; however, they do not explicitly address how to consider opinions and evidence from "other sources", including "non-medical sources" listed in §§ 404.1513(d) and 416.913(d). SSR 06-3p clarifies opinions from other sources "are important and should be evaluated on key issues such as impairment severity and functional effects." 2006 WL 2329939, at *3 (Aug. 9, 2006). SSR 06-3p also states other sources should be evaluated under the factors applicable to opinions from "acceptable medical sources" – i.e., how long the source has known and how frequently the source has seen the individual; consistency with the record evidence; specialty or area of expertise; how well the source explains the opinion; supportability; and any other factors that tend to support or refute the opinion. SSR 06-3p; 20 C.F.R. § 404.1527(d)(2).

In the Sixth Circuit, "an ALJ has discretion to determine the proper weight to accord opinions from 'other sources'". *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007). While the ALJ "does not have a heightened duty of articulation when addressing opinions issued by 'other sources', the ALJ must nevertheless "consider" those opinions. *Hatley v. Comm'r of Soc. Sec.*, 2014 WL 3670078 (N.D. Ohio); *see also Brewer v. Astrue*, 2012 WL 262632, at *10 (N.D. Ohio 2012) ("SSR 06-3p does not include an express requirement for a certain level of

analysis that must be included in the decision of the ALJ regarding the weight or credibility of opinion evidence from 'other sources.'").

The ALJ rejected Mr. Waldsmith's opinion because at Plaintiff's prior appointment he was "looking forward to a bike club event over the weekend in which he was preparing chicken wings. His affect was appropriate and his insight was good." (Tr. 70, 1038). In other words, the ALJ rejected Mr. Waldsmith's opinion because it is inconsistent with his treatment notes. This complies with the requirement that the ALJ weigh the other source opinion against the factors in 20 C.F.R. § 404.1527(d)(2).

Plaintiff argues Mr. Waldsmith's opinion "epitomize[s] the factors of consistency, length and frequency of treatment, and specialization factors". (Doc. 16, at 21). This may be true to a degree, however, the ALJ's reason for rejecting Mr. Waldsmith's opinion is supported by substantial evidence, and thus the Court will not overturn the ALJ's decision, even if substantial evidence also supports a different conclusion. *Jones*, 336 F.3d at 477.

Similarly, with Mr. Waldsmith's opinion in August 2012 that was co-signed by Dr. Connor, the ALJ found that Mr. Waldsmith's opinion that Plaintiff was markedly[4] limited in making simple workplace decisions was inconsistent with his opinion that Plaintiff could manage his own benefits. (Tr. 70, 1032-34). Although Mr. Waldsmith is an "other source" opinion, the co-signature by Dr. Connor, a psychologist and acceptable medical source who had previously examined Plaintiff. leads this Court to treat the opinion as that of an examining source. The effect of a co-signature from an acceptable medical source on an other source's opinion is unsettled. Although this issue has yet to be addressed by the Sixth Circuit, prior decisions have

---

4. The Court notes the ALJ mistakenly wrote that Mr. Waldsmith and Dr. Connor's opinion indicated he was extremely limited in making simple workplace decision when in fact the opinion said he was markedly limited in making simple workplace decisions. However, this error makes no difference to the outcome of this analysis and therefore the Court will disregard it.

held that a doctor's co-signature indicates at a minimum that the doctor agrees with the other source's opinion. *Brook v. Colvin*, 2012 WL 4501333, at *3-4 (M.D. Tenn.); *Phillips v. Comm'r of Soc. Sec.*, 2008 WL 4394272, at *3 (W.D. Mich.). It follows then, that if the signing physician or psychologist has personally examined the claimant, the opinion must be treated as the doctor's own.

Here, Dr. Connor is an examining source because the record reflects only one other time that she personally examined Plaintiff, on February 25, 2011, when she completed a mental status evaluation. (Tr. 70; 516-18).

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007). A treating physician's opinion is given "controlling weight" if it is supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." *Id.* When a treating physician's opinion does not meet these criteria, an ALJ must weigh medical opinions in the record based on certain factors. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.*

Non-treating sources are physicians, psychologists, or other acceptable medical sources who have examined the claimant but do not have, or did not have, an ongoing treatment relationship with them. 20 C.F.R. §§ 404.1502, 416.927. This includes a consultative examiner. *Id.* When determining what weight to give examining sources the same factors that are

considered for treating physicians must be considered including the supportability of the opinion and the consistency of the opinion with the record as a whole. *Id.*

Here, the ALJ discounted Dr. Connor's opinion because although she said Plaintiff was markedly limited in his ability to make simple workplace decisions, she still found that he could manage his own benefits. This goes to the consistency of the opinion, which is an acceptable reason for discounting Dr. Connor's opinion. Although the analysis may not have been in depth enough had Dr. Connor been a treating source, this analysis was sufficient. *Allen v. Comm'r*, 561 F.3d 646, 651 (6th Cir. 2009) ("the ALJ's reasoning may be brief").

### New Evidence

Lastly, Plaintiff argues remand is necessary for consideration of the new and material evidence presented to the Appeals Council but not to the ALJ. (Doc. 16, at 22). This evidence consists of medical records from Plaintiff's attendance at a physical rehabilitation center after the ALJ issued her decision. (Doc. 16, at 22); (Tr. 12-21, 30-57).

Under sentence six of 42 U.S.C. § 405(g), the district court does not affirm, modify, or reverse the Commissioner's decision; it does not rule in any way as to the correctness of the administrative determination. *Melkonyan v. Sullivan*, 501 U.S. 89 (1991); *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 734 (N.D. Ohio) ("'Sentence six' of 42 U.S.C. § 405(g) permits a reviewing court to remand, without ruling on the merits"); *see also*, *Anthony v. Comm'r of Soc. Sec.*, 2013 U.S. Dist. LEXIS 180708, at *6-8 (N.D. Ohio). If a sentence six remand is ordered, the district court retains jurisdiction while the matter is remanded to the social security administration for further proceedings; it is not a final judgment that can be appealed. *Melkonyan*, 501 U.S. 89; *Cross*, 373 F. Supp. 2d 724; *Wasik v. Comm'r of Soc. Sec.*, 2011 U.S. Dist. LEXIS 18106 (E.D. Mich.).

21

A claimant must establish two prerequisites before a district court may order a sentence six remand. *Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 484 (6th Cir. 2001). A claimant must show: (1) the evidence at issue is both "new" and "material"; and (2) there is "good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g); *see also Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996). The party seeking remand bears the burden of showing these two requirements are met. *See Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).

There is no doubt these medical records are new as they did not exist at the time of the hearing before the ALJ. Similarly, because the evidence was not in existence at the time of the hearing, it is evident that Plaintiff has good cause for not seeking admission of the evidence at the hearing. The remaining issue is whether the evidence is material.

Evidence is deemed "material" if "there is a probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with new evidence." *Foster*, 279 F.3d at 357.

Here, because the medical evidence came into existence after the ALJ decision in December 2012, this evidence does not pertain to the relevant time period. *Watson v. Astrue*, 2009 WL 3415356 at *4 (E.D. KY)(finding the relevant time period for SSI claims runs from the application through the date of the ALJ denial decision). "Evidence that demonstrates a [claimant's] deteriorating condition is not relevant to a remand determination under Sentence Six." *Wasik v. Comm'r*, 2011 WL 740686 at *6 (E.D. Mich.). Moreover, "[r]ecords that show a lack of improvement, which were created after the ALJ's disability determination, cannot be used to show disability existed at the time of the disability determination." *Id*. Evidence of the aggravation or deterioration of a condition is not relevant because "it does not demonstrate the

point in time that the disability itself began." *Guy v. Comm'r of Soc. Sec.*, 2013 U.S. Dist. LEXIS 37891, at *30-31 (E.D. Mich. 2013) (quoting *Sizemore v. Sec'y of Health & Human Servs*, 865 F.2d 709, 712 (6th Cir. 1988)).

Thus, because Plaintiff's records are from medical appointments that took place after the ALJ's decision, they are not material as they do not demonstrate that Plaintiff was disabled during the necessary period. *Id.*

Moreover, Plaintiff has not shown there is a reasonable probability the evidence would change the ALJ's decision. Although Plaintiff argues the records would provide evidence of Plaintiff's exertional limits and pain during physical therapy, his need for a cane and a TENS unit and his sleep apnea (Doc. 16, at 24), as Defendant correctly argues, without work related limitations included in the opinion, it is difficult for this Court to find there is a reasonable probability the evidence would change the ALJ's mind.

### CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the Court finds the Commissioner's decision denying DIB and SSI applied the correct legal standards and is supported by substantial evidence. Therefore, the decision of the Commissioner is affirmed.

IT IS SO ORDERED.

s/James R. Knepp, II
United States Magistrate Judge